UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

UNITED STATES OF AMERICA

v.                                    Case No.: 8:20-cr-138-T-36JSS

LUIS ELIAS ANGULO LEONES,
JHONIS ALEXIS LANDAZURI
ARBOLEDA, and
DILSON DANIEL ARBOLEDA
QUINONES
_____/

## REPORT AND RECOMMENDATION

THIS MATTER is before the Court on Defendant Angulo Leones's Motion to Dismiss Indictment (Dkt. 48), Defendant Arboleda Quinones's Motion to Dismiss for Lack of Jurisdiction (Dkt. 54) (collectively, "Motions to Dismiss"), and the Government's response in opposition (Dkt. 68). On October 13 and 14, 2020, the undersigned held an evidentiary hearing on the Motions to Dismiss. For the reasons that follow, the undersigned recommends that the Court deny Defendants' Motions to Dismiss.

## BACKGROUND

A March 19, 2020 indictment alleges that Luis Elias Angulo Leones, Jhonis Alexis Landazuri Arboleda, and Dilson Daniel Arboleda Quinones (collectively, "Defendants"), "while upon the high seas on board a vessel subject to the jurisdiction of the United States," conspired to knowingly and intentionally distribute and possess with the intent to distribute (Count I), and aided and abetted one another in possessing

with intent to distribute  (Count II), "five (5) kilograms or more of a mixture and substance containing a detectable amount of cocaine," in violation of 21 U.S.C. § 960(b)(1)(B)(ii), 46 U.S.C. §§ 70503(a), 70506(a), (b), and 18 U.S.C. § 2.  (Dkt. 1.)

On June 9, 2020 and June 15, 2020, Defendants filed the Motions to Dismiss, arguing that the vessel was not subject to the jurisdiction of the United States.  (Dkts. 48, 54.)  Defendant Landazuri Arboleda adopted the Motions to Dismiss.  (Dkt. 77.) The Motions to Dismiss are pending before the undersigned on referral from the presiding District Court Judge.  (Dkt. 60.)

On July 6, 2020, the Court noticed an evidentiary hearing on the Motions to Dismiss.  (Dkt. 69.)  Upon Defendants' motion and consent by the parties, the Court continued the hearing due to issues associated with the coronavirus pandemic, difficulties with video conferencing technology at the Pinellas County Jail, availability of witnesses, and the parties' preference for an in-person evidentiary hearing.  (Dkts. 74, 75.)  On October 13 and 14, 2020, the Court conducted an in-person evidentiary hearing on the Motions to Dismiss.[1]  (Dkts. 113, 114.)  All Defendants and witnesses appeared in-person before the Court during the hearing.

## FACTUAL FINDINGS

At the evidentiary hearing, the Court heard the testimony of United States Coast Guard Chief Boatswain's Mate Jeremy Swearer ("Chief Swearer"), United

---

[1] The Court simultaneously conducted an evidentiary hearing on Defendant Arboleda Quinones's Motion to Suppress Statements (Dkt. 53) and heard oral arguments on Defendant Angulo Leones's Motion for Bill of Particulars (Dkt. 44), adopted by all Defendants (Dkt. 77).  The Court will address these motions separately.

States Coast Guard Maritime Enforcement Specialist Luis Saenz ("Officer Saenz"), United States Coast Guard Boatswain's Mate First Class Seth Pontecorvo ("Officer Pontecorvo"), United States Coast Guard Petty Officer Second Class Nicholas Allen, and United States Coast Guard Lieutenant Kyle Pearson ("Lieutenant Pearson"). Additionally, the Court received into evidence without objection the Government's exhibits, which included a map showing the approximate location of the vessel's interdiction (Gov't Ex. 1), a detainee log maintained by the United States Coast Guard ("Coast Guard") during Defendants' detention (Gov't Ex. 2A), a medical history log maintained by the Coast Guard during Defendants' detention (Gov't Ex. 2B), documents allegedly signed by Defendant Arboleda Quinones (Gov't Ex. 3), the Alpha Report prepared by the Coast Guard during the interdiction (Gov't Ex. 4A), and the Victor Report prepared by the Coast Guard during the interdiction (Gov't Ex. 4B).  (Dkt. 121.)

The Court also received into evidence without objection six of Defendants' exhibits, which included a video of a portion of the interdiction (Def. Ex. 3), the Case Package prepared by the Coast Guard relating to the interdiction (Def. Ex. 4), photographs of the vessel (Def. Exs. 5-5k), the Alpha and Victor Reports (Def. Ex. 6), a Report of Investigation prepared by Special Agent Jose A. Ramirez (Def. Ex. 7), and a certificate from the United States Department of State, previously filed by the Government (Dkt. 93; Def. Ex. 11).  (Dkt. 119.)  Further, the Court received two of Defendants' exhibits into evidence over the Government's objection, which included a news article and a photograph of a different vessel (Def. Exs. 10, 10A).  Based on the

testimony and the exhibits entered into evidence, the undersigned recommends the following findings of fact.

On March 10, 2020, a maritime patrol aircraft observed a small "go fast vessel" ("GFV") in international waters of the Eastern Pacific Ocean, approximately 87 nautical miles south of Jicarita Island, Panama.  The vessel was operating in a known drug trafficking area, headed in a northbound direction, with at least fifteen fuel drums on deck.  The vessel had a white hull, blue interior, three engines, and three persons on board.  The vessel also bore the name *Divino Nino Jesus* on the forward portion of the hull and displayed the letters "PQ1647."   The patrol aircraft conveyed this information to Coast Guard Cutter *Mohawk* ("*Mohawk*"), which was on a patrol in the area.   Officers aboard the *Mohawk* were briefed on the observations of the aircraft personnel and a boarding team was dispatched to the vessel's location aboard the *Mohawk's* small over-the-horizon boat, HAWK 1.   The aircraft remained in flight around the vessel until HAWK 1 arrived.

At approximately 11:30 p.m. Zulu Time,[2] the Coast Guard launched HAWK 1 and Coast Guard personnel from the *Mohawk* (the "Boarding Team") to conduct right of approach questioning under international law.[3] The Boarding Team was comprised

---

[2] Coast Guard personnel testified that, while at sea, they use an international unit of time called "Zulu Time."  Zulu Time is denoted with a "Z" after the hourly time in Coast Guard documents.  Coast Guard personnel testified that during this interdiction, local time was approximately five hours behind Zulu Time.  Because the evidence and testimony received by the Court refer to Zulu Time, all times in this report and recommendation also refer to Zulu Time.

[3] "The 'right of approach' is a doctrine of international maritime common law that bestows a nation's warship with the authority to hail and board an unidentified vessel to ascertain its

of the following Coast Guard personnel: Chief Swearer, Officer Saenz, Officer Pontecorvo, Boatswain's Mate Second Class Harry T. Seibert, and Machinery Technician Petty Officer Third Class Don A. Castellon.   As HAWK 1 neared the vessel, the Boarding Team observed that the vessel was not moving, or was "dead in the water."   Although the sun had set, HAWK 1 was equipped with floodlights to illuminate the area.   Each Boarding Team member also carried a flashlight.   Additionally, HAWK 1 utilized a flashing blue light to indicate the Coast Guard's presence as a law enforcement agency.

After making visual contact with the subject vessel, the Boarding Team observed that the vessel had a white hull with blue trim, stripes on the forward bow, and stickers displaying numbers and letters.   Additionally, the Boarding Team observed a square or rectangle on the aft portion of the boat with colors that were similar to the stripes.   The Boarding Officer, Chief Swearer, relayed the Boarding Team's observations back to the *Mohawk*.   Pursuant to Coast Guard policy and in accordance with his training, Chief Swearer relayed the Boarding Team's observations of markings on the vessel with respect to shapes, colors, orientation, and location. Chief Swearer did not report whether he or his team members believed any of the markings correlated to the flag of any particular nation.

---

nationality."   *United States v. Romero-Galue*, 757 F.2d 1147, 1149 n.3 (11th Cir. 1985).   "The 'right of approach' is codified by article 22 of the Convention on the High Seas."   *Id.* (citing Convention on the High Seas art. 22, *opened for signature* Apr. 19, 1958, 13 U.S.T. 2312).

During the approach, Officer Saenz wore a GoPro device mounted to his helmet, which recorded a video of HAWK 1's approach of the vessel.  As HAWK 1 came alongside, Officer Saenz, the translator for the Boarding Team, announced their presence in Spanish.  HAWK 1 floated close enough to the subject vessel to allow Officer Saenz to communicate without the use of a bullhorn.  Chief Swearer, through Officer Saenz, directed Defendants to gather in the center portion of the vessel and Defendants complied.  After observing the vessel and asking some initial safety questions, Chief Swearer determined the Boarding Team had positive control of the situation and was therefore not in immediate danger.  Accordingly, Chief Swearer directed Officer Saenz to turn off the GoPro device.  Chief Swearer, through Officer Saenz, then began the right of approach questioning.

Aboard HAWK 1, Chief Swearer utilized laminated copies of the Alpha and Victor Reports, the forms used to administer the right of approach questioning.  Using a grease pen to mark up the laminated sheets, Chief Swearer recorded the Boarding Team's observations of the vessel and Defendants' responses to the questions.  Chief Swearer testified that he methodically worked his way through both the Alpha and Victor Reports by asking the questions on the reports, which Officer Saenz translated into Spanish for the Defendants.  Chief Swearer further testified, repeatedly and consistently, that he posed the questions to Officer Saenz using the exact language appearing on the reports.

Chief Swearer and Officer Saenz offered consistent, credible testimony regarding the right of approach questioning.  Question 3 on the Victor Report directs

the following question to be asked of the group collectively: "Who is the master or person in charge/PIC of the vessel?"  The second subpart of Question 3 directs that if no one is identified as the master or person in charge in response to the collective question, the Boarding Officer shall inquire of each crew member individually whether they are the master or person in charge.

Chief Swearer testified that all questions he asked through Officer Saenz came directly from the Alpha and Victor Reports.  Although he could not recall specifically whether Officer Saenz inquired about the person in charge, he did recall that none of the crew members claimed to be the master.  Further, he recalled that he directed Officer Saenz to ask the crew whether anyone wanted to make a claim of nationality for the vessel.  Chief Swearer testified that none of the crew members identified themselves as the master or made a claim of nationality for the vessel.

Officer Saenz, a native Spanish speaker and certified translator by the Department of Defense, testified that Chief Swearer directed him to ask for the master or person in charge of the vessel.  Officer Saenz had a clear and consistent recollection of the questioning.  He testified that he asked the questions directly to each crew member, extended his arm to each person individually, and asked them whether they were the captain or person in charge.  Each crew member denied being the captain or person in charge of the vessel. Officer Saenz further testified that he also asked each individual crew member whether he wanted to make a claim of nationality for the vessel.  While testifying, Officer Saenz demonstrated the manner in which he asked the questions, by extending his arm to point at each crew member to inquire of them

specifically.  Officer Saenz explained that each crew member responded that he did not want to make a claim of nationality.  However, the crew members did identify themselves as nationals of Ecuador and Colombia.  Additionally, the crew members stated that their last port of call was Malpelo, Colombia.  Officer Saenz testified that he relayed all responses from the crew members back to Chief Swearer.

Once the right of approach questioning concluded, Chief Swearer transmitted the information etched on the laminated sheets back to Coast Guard personnel in the Combat Information Center ("CIC") aboard the *Mohawk*.  The Boarding Team remained on HAWK 1 during the transmission process and awaited further instructions from the *Mohawk*.

The Coast Guard crew members in the CIC, overseen by Lieutenant Pearson, collected the information from Chief Swearer and filled out the versions of the Alpha and Victor Reports admitted into evidence.[4]  After receiving the necessary information from the Boarding Team, the crew members in the CIC relayed the information to "District 11," the command center located in California overseeing Coast Guard operations in the Eastern Pacific Ocean.  While the Boarding Team waited on HAWK 1 for further instructions, Chief Swearer and Officer Saenz testified that they understood District 11 contacted Colombian authorities pursuant to a treaty they

---

[4] As Boarding Officer, Chief Swearer reviewed the Alpha and Victor Reports recorded by the CIC to ensure completeness and accuracy before the reports were included in the case package for the interdiction.  The laminated sheets utilized aboard HAWK 1 were cleaned from the markings by the grease pen and returned to the *Mohawk's* boarding kit for future use.

colloquially referred to as the "United States-Colombian Bilateral Agreement."[5]  Chief Swearer did not know what response, if any, Colombia provided to District 11.  Officer Saenz testified that he understood that Colombia could not confirm or deny whether the vessel was Colombian, but also that he had no personal knowledge of the communications.  Officer Pontecorvo also testified that he had no personal knowledge of the timing or content of the communications with Colombia.[6]

At approximately 4:30 a.m. Zulu Time on March 11, 2020, personnel aboard the *Mohawk* advised Chief Swearer that District 11 granted the Boarding Team permission to board the target vessel as a vessel without a nationality.  Thereafter, the Boarding Team boarded the vessel and, pursuant to authorizations from District 11, conducted intrusive searches of the boat.  During the search, the Boarding Team drilled holes into the deck and found cocaine.  District 11 then granted the Boarding Team permission to treat the crew as detainees and return with them to the *Mohawk*. Due to its reduced stability from the destructive searches and potential as a navigation hazard, the Boarding Team sank the vessel and returned to the *Mohawk*.

The Coast Guard transported Defendants to Port Everglades, Florida. Defendants arrived on April 3, 2020 and were transported to the Middle District of Florida.

---

[5] *See* Agreement Between the Government of the United States of America and the Government of the Republic of Colombia to Suppress Illicit Traffic By Sea, Colom.-U.S., Feb. 20, 1997, T.I.A.S. No. 12835.

[6] The Victor Report provides that if there is a Colombian crew member on board a target vessel and a claim is made that the vessel departed from Colombia, as here, the Coast Guard should initiate the agreement protocols.

# ANALYSIS

## A. Claim of Nationality

In their Motions to Dismiss, Defendants argue that the indictment should be dismissed for lack of jurisdiction under the Maritime Drug Law Enforcement Act ("MDLEA").  *See* 46 U.S.C. §§ 70501–70508.  Specifically, Defendants argue that the Boarding Team failed to inquire whether any of the Defendants were the master or the individual in charge of the subject vessel during the right of approach questioning.  In response, the Government argues that the evidence established the Boarding Team conducted the proper colloquy to acquire jurisdiction.

Jurisdictional questions under the MDLEA "are preliminary questions of law to be determined solely by the trial judge."  46 U.S.C. § 70504(a).  The Eleventh Circuit has repeatedly recognized that "the MDLEA jurisdictional requirement is not an essential element" that must be submitted to a jury for proof beyond reasonable doubt. *United States v. Francisco*, 823 F. App'x 854, 857 (11th Cir. 2020); *see also United States v. Tinoco*, 304 F.3d 1088, 1109–10 (11th Cir. 2002) ("[T]he . . . jurisdictional requirement is not an essential ingredient or an essential element of the MDLEA substantive offense, and, as a result, it does not have to be submitted to the jury for proof beyond a reasonable doubt.").  In doing so, however, the Eleventh Circuit has expressly left open the question of whether "the government must establish the jurisdictional requirement beyond a reasonable doubt or by a preponderance of the evidence."  *Tinoco*, 304 F.3d at 1114; *see United States v. Guerro*, 789 F. App'x 742, 747 n.2 (11th Cir. 2019) (expressly leaving "open for another day" the issue of whether the

government must establish jurisdiction beyond a reasonable doubt or by a preponderance of the evidence).  It is recommended that the Government has met both standards of proof in this case.  *See Griffin v. United States*, 588 F.2d 521, 530 n.19 (5th Cir. 1979)[7] (choosing not to resolve issue concerning the burden of proof that should apply when the party carrying the burden had "met both burdens of proof").

The Constitution grants Congress the power to "define and punish Piracies and Felonies committed on the high Seas, and Offences against the Law of Nations."  U.S. Const. art. I, § 8, cl. 10.  In furtherance of this power, Congress passed the MDLEA, which makes it a crime to knowingly or intentionally "manufacture or distribute, or possess with intent to manufacture or distribute, a controlled substance," while "on board a covered vessel."  46 U.S.C. § 70503(a)(1).  A "covered vessel" is defined to include a vessel subject to the jurisdiction of the United States.  46 U.S.C. § 70503(e)(1).

The MDLEA recognizes six broad categories of vessels subject to the jurisdiction of the United States for purposes of criminal prosecution.  46 U.S.C. § 70502(c)(1).  One of the six categories is at issue here: stateless vessels, also known as vessels without nationality.  *Id.* § 70502(c)(1)(A); *see also United States v. Cruickshank*, 837 F.3d 1182, 1187 (11th Cir. 2016).  The MDLEA defines a vessel without nationality to include any of the following: (1) "a vessel aboard which the master or

---

[7] In *Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as precedent all decisions of the former Fifth Circuit Court of Appeals decided prior to October 1, 1981.

individual in charge makes a claim of registry that is denied by the nation whose registry is claimed"; (2) "a vessel aboard which the master or individual in charge fails, on request of an officer of the United States authorized to enforce applicable provisions of United States law, to make a claim of nationality or registry for that vessel"; and (3) "a vessel aboard which the master or individual in charge makes a claim of registry and for which the claimed nation of registry does not affirmatively and unequivocally assert that the vessel is of its nationality." 46 U.S.C. § 70502(d)(1)(A)-(C); *see also Guerro*, 789 F. App'x at 746–47 ("[A]n officer of the United States must request a claim of registry and the master or individual in charge must fail to answer that request before a vessel can be deemed stateless under § 70502(d)(1)(B).").

In support of their Motions to Dismiss, Defendants primarily rely on the Eleventh Circuit's decision in *United States v. Guerro,* 789 F. App'x 742 (11th Cir. 2019). During the right of approach questioning at issue in *Guerro*, the Coast Guard officer asked only for the "master of the vessel." *Id*. at 745. The crew members did not respond, and the officer then asked each of the men individually whether he was the master. *Id*. The crew members again did not respond. The three men were subsequently indicted for conspiracy and possession with intent to distribute narcotics under the MDLEA. *Id*. The defendants moved to dismiss the indictment and for a judgment of acquittal based on lack of jurisdiction, but the District Court denied both motions. *Id*. at 745–46.

On appeal, the Eleventh Circuit reversed, finding that the court lacked subject matter jurisdiction under the MDLEA. *Id.* at 747–49. The Court concluded that

although the Coast Guard asked for the master of the vessel, this inquiry alone "was not enough" to establish jurisdiction under § 70502(d)(1)(B).  *Id.* at 748–49 ("The master and the individual in charge are not one and the same.").  The Court reasoned that because the Coast Guard failed to ask for both the master and individual in charge, it was possible that one of the three defendants had the authority to make a claim of nationality for the vessel but was never asked to do so at the request of an officer.  *Id.* at 749.  Further, the Court noted that the Coast Guard "never requested the defendants to make a claim of nationality or registry for the vessel."  *Id.* at 750.  Due to these shortcomings in the right of approach questioning, the Court held that the government failed to establish jurisdiction under the MDLEA and vacated the judgments of conviction.  *Id.* at 750–51.

After *Guerro* was decided, the Eleventh Circuit further clarified the necessary inquiry to establish jurisdiction under the MDLEA in *United States v. Medina*, 793 F. App'x 850 (11th Cir. 2019).  During the interdiction in *Medina*, the Coast Guard officer "first asked all assembled crew members who was the master of the vessel and then, when none responded, asked if any crew member wished to make a claim of the nationality of the vessel."  *Id.* at 852.  The Court reasoned that because the entire crew was present during this questioning, "any individual who possessed the authority to make a claim of registry or nationality for the vessel was given the opportunity to do so at the request of a duly authorized officer."  *Id.*  The Court found this inquiry

sufficient to establish jurisdiction under § 70502(d)(1)(B).[8]  *Id.*; *see also United States v. Cabezas-Montano*, 949 F.3d 567, 589 n.14 (11th Cir. 2020), *cert. denied sub nom. Palacios-Solis v. United States*, __ S. Ct. ___, No. 19-1195, 2020 WL 3492674 (U.S. June 29, 2020), *cert. denied sub nom. Guagua-Alarcon v. United States*, __ S. Ct. ___, No. 19-8889, 2020 WL 6551776 (U.S. Nov. 9, 2020), and *cert. denied,* __ S. Ct. ___, No. 19-8910, 2020 WL 6551777 (U.S. Nov. 9, 2020) ("We recognize that the LRI boarding team did not ask who was 'the individual in charge,' but the team's questions were nevertheless sufficient because they did ask all defendants if anyone wished to make a claim of nationality for the vessel.").

Here, the evidence presented establishes that Chief Swearer directed Officer Saenz to ask the right of approach questions pursuant to the Alpha and Victor Reports. Although Chief Swearer did not specifically recall asking about the person in charge, he repeatedly testified that all questions were taken directly from the reports, verbatim.[9]  The Court observed the demeanor of Chief Swearer on the witness stand and considered his interests in testifying.  Chief Swearer was forthright about the limitations of his recollection.  But his consistent testimony that he asked all the

---

[8] The District Court in *Medina* found that the inquiring Coast Guard officer testified that "no Defendant identified himself as the master of the vessel and no Defendant made any claim of nationality regarding the vessel." *United States v. Bautista*, No. 4:17-cr-10003-KMM, slip op. at 4 (S.D. Fla. Apr. 17, 2017), *report and recommendation adopted*, No. 4:17-cr-10003-KMM (S.D. Fla. Apr. 29, 2017).

[9] As noted above, Question 3 on the Victor Report reads: "Who is the master or person in charge/PIC of the vessel?"

questions as they were listed in the Alpha and Victor Reports was persuasive.   The Court finds that Chief Swearer's testimony was credible.

Moreover, Chief Swearer's testimony was corroborated by the testimony of Officer Saenz.   Officer Saenz had a clear recollection of events and testified about numerous details, including the weather conditions and his specific location in relation to Defendants while he was asking the questions.   Officer Saenz demonstrated before the Court with affirmative physical motions the way he asked questions of each Defendant aboard the vessel.   He unequivocally testified that he used his arm to point at each person as he inquired of them.   First, he asked each Defendant whether they were the captain or the person in charge of the vessel and waited for their response. None of the Defendants claimed to be in charge of the vessel or indicated that any of the other Defendants were in charge.   After relaying this response to Chief Swearer, Officer Saenz asked whether any of the Defendants wanted to make a claim of nationality for the vessel, in the same manner, by extending his arm to point at each individual separately.   Officer Saenz testified that all Defendants declined to make a claim of nationality for the vessel.    The Court observed Officer Saenz's demeanor while testifying and considered his interests as well.   He appeared at ease, confident in his recollection, and forthright in his testimony.   Officer Saenz's testimony was clear, internally consistent, externally consistent with Chief Swearer's testimony, and was credible.

Based upon the officers' testimony and evidence, the Court finds that the Boarding Team asked for both the master and individual in charge of the subject vessel.

Even further, all persons aboard the subject vessel were given an opportunity to make a claim of nationality for the vessel, upon the request of a United States officer, but failed to do so.  Therefore, the Government satisfied its burden to establish jurisdiction over the vessel under § 70502(d)(1)(B).  *Medina*, 793 F. App'x at 852 (holding MDLEA jurisdiction established under § 70502(d)(1)(B) where "any individual who possessed the authority to make a claim of registry or nationality for the vessel was given the opportunity to do so at the request of a duly authorized officer" but failed to do so). Consequently, MDLEA jurisdiction was established in this case both beyond reasonable doubt and by a preponderance of the evidence.  *See, e.g.*, *United States v. De La Cruz*, 443 F.3d 830, 832 (11th Cir. 2006) (per curiam).

Defendants argue that Chief Swearer's testimony was inconsistent with that of Officer Saenz, based upon Chief Swearer's written statement in the case package. Specifically, Defendants maintain that Chief Swearer's written statement failed to identify that he directed Officer Saenz to ask for both the master and individual in charge.  Defendants further contend that Chief Swearer "adopted his statement" during his testimony.

As previously explained, Chief Swearer and Officer Saenz testified consistently regarding the administration of the right of approach questioning.  Chief Swearer candidly stated that he did not recall specifically whether he directed Officer Saenz to ask for the person in charge, but repeatedly testified that all questions were posed using the exact language of the Alpha and Victor Reports.  Chief Swearer further testified that he methodically worked through both reports.  Officer Saenz testified that he

asked for both types of potential authority, and that he inquired of each crew member individually whether they wanted to make a claim of nationality for the vessel. Both officers responded directly and without evasiveness to all questions posed on direct and cross-examination. Further, both officers explained that statements prepared after the interdiction are not intended to be an exhaustive record of every aspect, question, and detail of the interdiction. The Court finds that Chief Swearer's written statement is not inconsistent with and does not undermine the credibility of his or Officer Saenz's in-court testimony.

Defendants further assert that Officer Saenz was not a credible witness because he did not recall collecting Defendants' personal belongings from the subject vessel, as indicated in his statement.[10] In response to direct questions on this issue, Officer Saenz candidly stated he did not recall whether he personally collected Defendants' personal items off the boat. However, he explained that he performed the job of collecting belongings during other interdictions, so he was not surprised to learn that his statement indicated he was responsible for the task here. Officer Saenz was candid, stating that he did not specifically remember being given the responsibility of collecting personal belongings during this interdiction.

The Court notes that this interdiction took place over the course of more than fifteen hours. The right of approach questions were asked within the first few hours of

---

[10] The Court notes that this inquiry was made during testimony on Defendant Arboleda Quinones' Motion to Suppress, rather than the Motions to Dismiss. However, counsel for Defendant Arboleda Quinones raised the issue in closing argument on the Motions to Dismiss, so the Court addresses it here.

the interdiction, while the collection of Defendants' belongings did not occur until hours later.  After having observed Officer Saenz's testimony on the stand and hearing his specific recollection of the colloquy, as well as his candid testimony regarding the limitations of his recollection, the Court finds Officer Saenz's testimony to be credible. Thus, the Court concludes that Officer Saenz's credibility was not undermined by his failure to specifically recall whether he personally collected Defendants' personal belongings from the subject vessel.

Having observed Chief Swearer's and Officer Saenz's in-court testimony, considered their interests in testifying as well as the consistencies and inconsistences in their testimony, and considered the statements prepared by them, the Court finds the testimony of Chief Swearer and Officer Saenz to be consistent and credible. *See generally United States v. Ramirez-Chilel*, 289 F.3d 744, 750 (11th Cir. 2002) (deferring to magistrate judge's credibility determination where magistrate judge took into account "the interests of the witnesses, the consistencies or inconsistencies in their testimonies, and their demeanor on the stand").

In sum, the evidence presented demonstrates that the Coast Guard affirmatively asked each crew member whether he was the master or individual in charge and whether he wanted to make a claim of nationality for the vessel.  Each crew member declined to make any such claim.   The Coast Guard's thorough questioning extinguished the possibility that someone aboard the vessel had the authority to make a claim of nationality for the vessel but was not asked to do so by the Coast Guard. *Contra Guerro*, 789 F. App'x at 749 ("[I]t is equally possible one of the three defendants

possessed the authority as the individual in charge to make a claim of registry or nationality for the vessel. That possibility means, in turn, that the government failed to prove there was no one on board the vessel who could make a claim of registry or nationality.").  This evidence establishes that the vessel was "without nationality," as defined under § 70502(d)(1)(B), and that the vessel was therefore subject to the jurisdiction of the United States under § 70502(c)(1)(A).  *Cabezas-Montano*, 949 F.3d at 589 ("Despite being given two opportunities, the defendants did not produce any nationality documents, did not fly any nation's flags, and did not make any verbal claim of nationality or registry."); *Medina*, 793 F. App'x at 852 ("[A]ny individual who possessed the authority to make a claim of registry or nationality for the vessel was given the opportunity to do so at the request of a duly authorized officer.").

## B. Indicia of Nationality

Defendants also argue that the Coast Guard improperly treated the vessel as one without a nationality because the *Divino Nino Jesus* bore markings and an ensign suggesting that the vessel was Costa Rican.  According to Defendants, the markings on the exterior of the vessel were sufficient indicia of nationality to make a claim of nationality for the vessel.

Under § 70502(e), a claim of nationality or registry for purposes of establishing jurisdiction "includes only": (1) possession and production of documents demonstrating the vessel's nationality; (2) "flying its nation's ensign or flag"; or (3) a verbal claim of nationality by the master or individual in charge.  46 U.S.C. § 70502(e). In *United States v. Obando*, 891 F.3d 929 (11th Cir. 2018), the Eleventh Circuit directly

addressed the issue of whether a painted ensign on the hull of a vessel is a "flying flag" under the MDLEA.  In *Obando*, the Court found that a painted flag is not a "flying" flag, reasoning that the ordinary meaning of the word "flying" requires "a flag to be capable of freely moving in the air."  891 F.3d at 934.  The Court further examined the text of the MDLEA and other federal statues to conclude that "'[f]lying' refers to a particular method of displaying a flag, and the Maritime Drug Law Enforcement Act uses this specific word instead of the more general term 'displaying.'"  *Id.* at 935.  The Court also examined its precedent to note that "a flying flag is *distinct* from other visual displays that also suggest nationality," such as markings or visual depictions.  *Id.* at 936–37.  Accordingly, the Court held that a flag must be "hoisted in the air" to establish a claim of nationality or registry under the MDLEA.  *Id.* at 938; *see also United States v. Bautista Ortiz*, 808 F. App'x 984, 988 n.1 (11th Cir. 2020) (noting that "the Colombian flag painted on the vessel was not flying and, therefore, would not satisfy a claim of nationality").

   There is no dispute that the *Divino Nino Jesus* was not flying a flag at the time of the interdiction.  Although Defendants suggest that it is customary to lower a flag at night, the Boarding Team did not find a flag capable of being hoisted during their extensive search of the vessel.  Regardless, pursuant to the Eleventh Circuit's decision in *Obando*, the painted emblems, stripes, and color scheme displayed on the *Divino Nino Jesus* did not establish a claim of nationality or registry under 46 U.S.C. § 70502(e).  *Obando*, 891 F.3d at 934–38.

## C. Communications with Colombia

Finally, Defendants also argue that the United States could not assert jurisdiction over the *Divino Nino Jesus* because the Coast Guard incorrectly determined that Colombia was an appropriate country to contact for a nationality inquiry. (Dkt. 48 at 12–13; Dkt. 54 at 13.) According to Defendants, because no one made a claim of Colombian nationality for the vessel, and the vessel was not near Colombian waters, there was no basis to contact Colombia. (Dkt. 48 at 12–13.) In response, the Government maintains that after the Defendants failed to make a claim of nationality when asked, any attempt to contact Colombia was a "courtesy call" because the vessel could already be deemed stateless pursuant to § 70502(d)(1)(B). (Dkt. 68 at 12.)

The Eleventh Circuit addressed a similar issue in *United States v. Cabezas-Montano*. 949 F.3d at 589–90. In *Cabezas-Montano*, the Court affirmed the District Court's finding of MDLEA jurisdiction where the Coast Guard contacted Ecuador after learning the vessel's last port of call was in Ecuador and observing an Ecuadorian mark on the vessel. 949 F.3d at 589–90. The Court characterized this as a "courtesy call" that "did not create a nationality claim on behalf of the defendants and their vessel where no master presented himself or actively made a claim of nationality." *Id.* at 590. The Court further found:

> It also is of no matter that the Coast Guard takes the last port of call as the nationality of the vessel and contacts that corresponding government when no claim is made. Whatever the foreign government's response (or non-response), the Coast Guard's taking of that additional step does not void a statelessness finding under §§ 70502(c)(1)(A) and 70502(d)(1)(B).

*Id.*

Here, after learning that two of the crew members were Colombian nationals and their last port of call was in Colombia, the Coast Guard contacted Colombia to inquire whether the *Divino Nino Jesus* was a Colombian vessel. As explained above, the Boarding Team members who testified before the Court had no personal knowledge of the communications with Colombian officials. Based upon the evidence, the Coast Guard's decision to contact Colombia was a "courtesy call," indistinguishable from the one at issue in *Cabezas-Montano*. Here, Defendants failed, upon the request of a United States officer, to make a claim of nationality for the vessel. Thereafter, the Coast Guard contacted Colombia, but was under no obligation to do so under the MDLEA because no claim of nationality had been made. *Cabezas-Montano*, 949 F.3d at 590. As such, Colombia's response, regardless of its content, "does not void a statelessness finding" under the MDLEA. *Id.*

## D. Arguments Raised for the First Time at the Hearing

On September 29, 2020, the Government filed a certification from the United States Department of State in support of its response in opposition to the Motions to Dismiss. (Dkt. 93.) The State Department certified that on March 11, 2020, the Republic of Colombia "replied that it could neither confirm nor deny" nationality of the *Divino Nino Jesus*. (Dkt. 93-1.) Additionally, the State Department certified that on July 1, 2020, the Republic of Costa Rica confirmed that the vessel was not registered in Costa Rica.

During the evidentiary hearing, Defendants attempted to raise additional arguments that had not been briefed to the Court, including, without limitation, issues relating to the State Department certification. However, the Court did not receive any briefing concerning these arguments. As these issues were not properly raised before the evidentiary hearing, the Court declines to consider them at this time. *See, e.g.*, *Ocasio v. C.R. Bard, Inc.*, No. 8:13-cv-1962-T-36AEP, 2020 WL 3288026, at *2 n.1 (M.D. Fla. June 18, 2020) (declining to consider new arguments raised for the first time at oral argument); *Starbuck v. R.J. Reynolds Tobacco Co.*, 349 F. Supp. 3d 1223, 1229 (M.D. Fla. 2018) (noting that an argument not appearing in the proponent's briefing was not properly before the Court); *Rivas v. Berryhill*, No. 16-cv-61861, 2018 WL 328796, at *4 (S.D. Fla. Jan. 9, 2018) (explaining that courts have discretion to decline to consider new arguments raised for the first time at oral argument).

Accordingly, it is **RECOMMENDED** that:

1. Defendant Angulo Leones's Motion to Dismiss Indictment (Dkt. 48) be **DENIED**; and

2. Defendant Arboleda Quinones's Motion to Dismiss for Lack of Jurisdiction (Dkt. 54) be **DENIED**.

**IT IS SO REPORTED** in Tampa, Florida, on December 11, 2020.


JULIE S. SNEED
UNITED STATES MAGISTRATE JUDGE


## NOTICE TO PARTIES

A party has fourteen days from this date to file written objections to the Report and Recommendation's factual findings and legal conclusions.  A party's failure to file written objections waives that party's right to challenge on appeal any unobjected-to factual finding or legal conclusion the district judge adopts from the Report and Recommendation.  *See* 11th Cir. R. 3-1.

Copies furnished to:
The Honorable Charlene E. Honeywell
Counsel of Record